IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
CITIZENS FOR RESPONSIBILITY AND            )
   ETHICS IN WASHINGTON,                    )
                                          )
       Plaintiff,                             )
                                          )
          v.                                   )    Civ. A. No. 11-CV-00592-RJL
                                          )
U.S. DEPARTMENT OF JUSTICE,                )
                                          )
       Defendant.                             )
_____)

## DECLARATION OF DAVID M. HARDY

      I, David M. Hardy, declare as follows:

      (1)    I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Record Management Division ("RMD"), at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C., and currently relocated to Winchester, Virginia. I

have held this position since August 1, 2002. Prior to joining the FBI, from May 1, 2001 to July

31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that

capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures,

appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy

Judge Advocate at various commands and routinely worked with FOIA matters. I am also an

attorney who has been licensed to practice law in the state of Texas since 1980.

      (2)    In my official capacity as Section Chief of RIDS, I supervise approximately 276

employees who staff a total of ten (10) units and two field operational service center units whose

collective mission is to effectively plan, develop, direct and manage responses to requests for

access to FBI records and information pursuant to the FOIA; the Privacy Act of 1974; Executive

Order 13526; Presidential, Attorney General and FBI policies and procedures; judicial decisions and other Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. Specifically, I am aware of the FBI's response to plaintiff's October 19, 2010 FOIA request to FBIHQ which sought access to witness statements, investigation reports, prosecution memoranda, and FBI FD-302 reports related to the FBI's and DOJ's investigation of former House Majority Leader Tom DeLay.

(4)     The FBI submits this declaration in support of Defendant's motion for summary judgment, and will provide the Court and plaintiff with a description of the administrative history of plaintiff's request and the FBI's response to that request.

## PROCEDURAL HISTORY OF PLAINTIFF'S FOIA REQUEST

(5)     By faxed letter dated October 19, 2010 plaintiff submitted a FOIA request to the FBI seeking access to:

> any witness statements, investigation reports, prosecution memoranda, and Federal Bureau of Investigation ("FBI") 302 reports related to the FBI's and DOJ's investigation of former House Majority Leader Tom DeLay. This includes, but is not limited to, the FBI's and DOJ's investigation of relationships between Mr. DeLay and Christine Delay, Dani DeLay, Jack Abramoff, Edwin Buckham, Tony Rudy, Michael Scanlon, Susan Hirshmann, the Alexander Strategy Group, the National Center for Public Policy Research, eLottery, Inc., the U.S. Family Network, Americans for a Republican Majority PAC ("ARMPAC"), Texans for a Republican Majority PAC ("TRMPAC"), and/or the Commonwealth of the Northern Marianas Islands.

Plaintiff's request cited to various media reports regarding Congressman DeLay's criminal investigation, which it attached as Exhibits A through J thereto. In its request, plaintiff sought expedited processing and a waiver of all search and duplication fees. (See Exhibit A).[1]

(6)     In a faxed letter also dated October 19, 2010, plaintiff directed its request for expedited processing to Matthew Miller, Director, U.S. Department of Justice ("DOJ") Office of Public Affairs ("OPA"). (See Exhibit C). In granting plaintiff's request for expedited processing pursuant to 28 C.F.R. § 16.5(d)(1)(iv), OPA Director Miller concluded, on or about October 25, 2010, that the topic of plaintiff's request is a matter of "widespread and exceptional media interest" and that the topic is a matter "in which there exist possible questions about the government's integrity which affect public confidence." (See Exhibit C).

(7)     By letter dated October 22, 2010, the FBI advised plaintiff that its third-party request for information pertaining to Tom DeLay had been assigned FOIPA Number 1156044-000, but because it had requested records concerning a third party, the FBI could not process the request without either the express authorization and consent of the third party, proof that the third party was deceased, or a clear demonstration that the public interest in disclosure outweighed the third party's personal privacy interest and that a significant public benefit would result from the disclosure of the requested records. The FBI enclosed a Certificate of Identity form, advising plaintiff to have the third-party subject fill it out, sign, and return it with a notarized authorization with an original signature. RIDS informed plaintiff that, even if it could not meet these requirements, the FBI would still search for any public records maintained in its files, such as

---

[1] RIDS received a duplicate FOIA request from plaintiff by mail on November 2, 2011, which it scanned in and added to plaintiff's already-pending FOIA request. (See Exhibit B).

court records and news clippings, if plaintiff so desired, but also cautioned that its response "should not be considered an indication of whether or not records responsive to your request exist in FBI files." RIDS further informed plaintiff that it had to receive a written request from plaintiff for any public documents within 30 days of the date of the FBI's letter, but that its response "should not be considered an indication of whether or not records responsive to [its] request exist in FBI files." Finally, RIDS advised plaintiff that it could file an appeal within sixty (60) days from the date of the FBI's letter by writing to the Director, Office of Information Policy ("OIP"), DOJ, 1425 New York Avenue, NW, Suite 11050, Washington, D.C. 20530-0001. (See Exhibit D).

 (8) By letter dated November 9, 2010, and received on November 18, 2010, plaintiff appealed to OIP, challenging "the refusal of the Federal Bureau of Investigation ("FBI") to process and release to CREW any records responsive to our Freedom of Information Act ("FOIA") request of October 19, 2010." (See Exhibit E).

 (9) In a letter dated November 24, 2010, OIP advised CREW that it had assigned appeal number AP-2011-00398 to its administrative appeal, and further advised plaintiff that it would receive a decision on its appeal as soon as possible. (See Exhibit F).

 (10) Plaintiff did not respond to the FBI's October 22, 2010 letter, nor did it provide a valid third-party waiver or proof of death or request any public source material. As a result, RIDS administratively closed plaintiff's FOIA request on or about December 14, 2010. Plaintiff filed suit on or about March 22, 2011, seeking injunctive and declaratory relief.

 (11) By letter dated April 7, 2011, OIP informed plaintiff that it had closed its administrative appeal due to the commencement of litigation. (See Exhibit G).

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(12)     The Central Records System ("CRS"), which is utilized to conduct searches in

response to FOIA and Privacy Act requests, enables the FBI to maintain all information which it

has acquired in the course of fulfilling its mandated law enforcement responsibilities. The

records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other

files compiled for law enforcement purposes. This system consists of a numerical sequence of

files broken down according to subject matter. The subject matter of a file may relate to an

individual, organization, company, publication, activity, or foreign intelligence matter (or

program). Certain records in the CRS are maintained at FBIHQ. Records that are pertinent to

specific field offices of the FBI are maintained in those field offices. Although the CRS is

primarily designed to serve as an investigative tool, the FBI utilizes the CRS to conduct searches

that are likely to yield documents responsive to FOIA and Privacy Act requests. The mechanism

that the FBI uses to search the CRS in the Automated Case Support System ("ACS").

(13)     Access to the CRS is obtained through the General Indices, which are arranged in

alphabetical order. The General Indices consist of index cards on various subject matters that are

searched either manually or through the automated indices. The entries in the General Indices

fall into two categories:

> (a) A "main" entry — A "main" entry, or "main" file, carries the name
> corresponding with a subject of a file contained in the CRS.
>
> (b) A "reference" entry — "Reference" entries, sometimes called "cross-
> reference" is generally only a mere mention or reference to an individual,
> organization, or other subject matter, contained in a document located in another
> "main" file on a different subject matter.

(14)     Access to the CRS files at FBI field divisions is also obtained through the General

Indices (automated and manual), which are likewise arranged in alphabetical order, and consist

of an index on various subjects, including the names of individuals and organizations. Searches

made in the General Indices to locate records concerning a particular subject, such as "Tom

DeLay," are made by searching the subject requested in the index. FBI field offices have

automated indexing functions.

(15)    On or about October 16, 1995, the ACS system was implemented for all field

offices, Legal Attaches ("Legats") and FBIHQ in order to consolidate portions of the CRS that

were previously automated. Because the CRS cannot electronically query the case files for data,

such as an individual's name or social security number, the required information is duplicated

and moved to the ACS so that it can be searched. Over 105 million records from the CRS were

converted from automated systems previously utilized by the FBI. Automation did not change

the CRS; instead, automation has facilitated more economic and expeditious access to records

maintained in the CRS.

(16)    ACS consists of three integrated, yet separately functional, automated applications

that support case management functions for all FBI investigative and administrative cases:

(a) Investigative Case Management ("ICM") – ICM provides the ability to open,
assign, and close investigative and administrative cases as well as to set, assign,
and track leads. The Office of Origin ("OO"), which sets leads for itself and other
field offices, as needed, opens a case. The field offices that receive leads from the
OO are referred to as Lead Offices ("LOs") – formerly known as Auxiliary
Offices. When a case is opened, it is assigned a Universal Case File Number
("UCFN"), which is utilized by all FBI field offices, Legats, and FBIHQ that are
conducting or assisting in the investigation. Using a fictitious file number "111-
HQ-12345" as an example, and explanation of the UCFN is as follows: "111"
indicates the classification for the specific type of investigation; "HQ" is the
abbreviated form used for the OO of the investigation, which in this case is
FBIHQ; and "12345" denotes the individual case file number for the particular
investigation.

-6-

(b) Electronic Case File ("ECF") – ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept, in that only the creator of a document serializes it into a file. This provides single-source entry of serials into the computerized ECF system. All original serials are maintained in the OO case file.

(c) Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index: however, the LOs may index additional information as needed. UNI, an index of approximately 110.0 million records, functions to index names to cases, and to search names and cases for use in FBI investigations. Names of individuals or organizations are recorded with identifying applicable information, such as sex, race, date or place of birth, locality, Social Security number, address, and/or date of event.

(17)   The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent ("SA") assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal and national security statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its files on a particular subject matter or individual.

## FBI'S RESPONSE TO PLAINTIFF'S REQUEST

(18)   The FBI's long-standing policy has been to provide an Exemption 6 and 7(C) *Glomar* response, neither confirming nor denying the existence of records in those instances

where an individual seeks access to information regarding a third party but fails to provide a

Privacy Waiver from the third party, or proof of death of that third party.[2]  (See 28 C.F.R. §

16.3(a)).  The third prong of the FBI's third-party *Glomar* policy is whether the requester is able

to provide sufficient evidence of a significant public interest in disclosure of the materials

sought.[3]  Without receipt of a Privacy Waiver, proof of death, or a showing of significant public

interest in the disclosure of the materials sought, the FBI will neither confirm nor deny the

existence of records pertaining to a third party pursuant to 5 U.S.C. §§ 552(b)(6) and (b)(7)(C).[4]

Such a response is necessary because members of the public are likely to draw adverse inferences

from the mere fact that an individual is mentioned in the files of a criminal law enforcement

---

[2]  In May 2010, the FBI modified its third-party response letter to expressly notify requesters of the balancing of the public's interest in disclosure against the individual's privacy interest.  This modification reflected the FBI's continued commitment to fair treatment of requests and requesters.

[3]  At times, the FBI has searched for responsive records even if the requester has not made an explicit showing under this third prong if the requester is able to show – or it is clear from the request itself – that the subject of the request is a public figure, or if the FBI's role in an investigation has already been officially acknowledged.  In those instances, the FBI has released only public source information, and absent a showing of significant public interest sufficient to outweigh the subject's retained privacy interest in the information, the FBI has withheld that information in full, invoking FOIA Exemptions 6 and 7(C).

[4]  5 U.S.C. § 552 (b)(6) exempts from disclosure "personnel and medical files and similar files when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy."  Similarly, 5 U.S.C. § 552 (b)(7)(C) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  The practice of the FBI is to assert Exemption (b)(6) in conjunction with Exemption (b)(7)(C).  Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard, and the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion.  The privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions.

agency such as the FBI, and cast them in an unfavorable or negative light. Moreover, release of names and/or other personal information about these individuals could cause unsolicited and unnecessary attention to be focused on them. Individuals – whether they are suspects, witnesses, or law enforcement personnel – have a strong interest in not being associated unwarrantedly with alleged or actual criminal activity. These individuals maintain strong privacy interests in not having their personal information disclosed.

(19)     After identifying the substantial privacy interests of third parties mentioned in its investigative files, the FBI balances those interests against the public interest in disclosure and evaluates – on a case-by-case basis – whether there is a significant public benefit which would result from the disclosure of the requested records. If there is a significant public interest which outweighs the substantial privacy interests of the subject involved or if certain information about the third party has already been officially acknowledged, the FBI would typically "pierce" the *Glomar* 6 and 7(C) "veil" and acknowledge the existence of files. In most cases, there is no discernable public interest in disclosure of such acknowledged information because disclosure of information in FBI investigative files regarding specific third-parties information does not shed light on the activities of the FBI, and as a result disclosure would constitute a clearly unwarranted and an unwarranted invasion of their personal privacy. In order to justify disclosure a requester must make a clear demonstration that the public interest in disclosure outweighs the third party's personal privacy interest and that a significant public benefit would result from the disclosure of the requested third-party records. Moreover, a requester who asserts a "government misconduct public interest" must produce evidence that would be deemed believable by a "reasonable person" for there to exist a counterweight on the FOIA scale to allow the FBI to balance against

-9-

the cognizable privacy interests in the requested records.  When governmental misconduct is alleged as the justification for disclosure, as plaintiff has in this case, the public interest is insubstantial unless the plaintiff puts forward *compelling evidence* that the agency denying the FOIA request is engaged in illegal activity and shows that the information sought is necessary in order to confirm or refute that evidence.

(20)   In response to plaintiff's administrative request, the FBI first determined that plaintiff's third-party request for law enforcement records related to Congressman Tom DeLay was not accompanied either by a Privacy Waiver or a proof of death.[5]  Despite the nature of the public office he once occupied, former Congressman Tom DeLay, as with other third-party individuals, does maintain a strong privacy interest in not having the FBI confirm or deny the existence of personal and other information in its files.  While at one time former Congressman DeLay had been a public figure by virtue of the office he had occupied, the FBI also recognized that government officials do not surrender all rights to personal privacy by virtue of public appointment.  In this case, former Congressman DeLay had at one time been a public figure by virtue of the public office he occupied by representing Texas' 22nd congressional district in the U.S. House of Representatives from 1984 to 2006 and serving as the House Majority Leader from 2003 to 2005, in the 108th and 109th Congress.[6]  He resigned in 2006 on the day he was indicted in Travis County, Texas for charges related to money laundering and conspiracy to

---

[5] Although not explicitly addressed in RIDS's October 22, 2010 letter, plaintiff's request also involved several other third parties for whom plaintiff did not provide privacy waivers, proof of death or sufficient public interest:  Christine Delay, Dani DeLay, Jack Abramoff, Edwin Buckham, Tony Rudy, Michael Scanlon, and Susan Hirshmann.

[6] See Office of the Clerk, U.S. House of Representatives, House History, http://artandhistory.house.gov/house_history/leaders.aspx.

engage in money laundering.[7]  With the foregoing as a back-drop, RIDS's analysis has taken into account that a third-party's privacy interest such as Mr. DeLay's is not extinguished merely because the public may be aware – by virtue of media coverage – that an individual who has been the subject of a state prosecution may have also been the target of a federal investigation.

(21)     Although not stated in the request portion of its October 19, 2010 letter to the FBI, CREW attempted to advance a public interest argument in seeking a fee waiver by stating that "[t]hese records are likely to contribute to greater public awareness of alleged malfeasance and possible criminal behavior by the former majority leader of the House of Representatives, and of DOJ's recently concluded investigation into Mr. DeLay's activities."  Moreover, CREW argued that "[w]hile DOJ eventually decided not to prosecute Mr. DeLay, his activities still may have been illegal or violations of the rules of the House of Representatives, and the requested records would shed light on them."  Nevertheless, plaintiff failed to provide any evidence to demonstrate how the records it seeks would inform the public about the operations of the FBI; how the public interest is "significant;" or how the information is likely to advance the public interest.  The FBI also took into account that a third-party's privacy interest is not extinguished merely because there has been widespread public and media speculation that former Congressman DeLay may or may not have been the target of an FBI or DOJ investigation.  As a result, based on all of the foregoing considerations, the FBI appropriately asserted an Exemption 6 and 7(C) Glomar response, neither confirming nor denying the existence of records related to former Congressman

---

[7]  The facts in the state case were largely not in dispute.  Mr. Delay funneled $190,000 in corporate contributions to Republicans in the state's 2002 legislative elections. The question for the jury was whether the money transfers constituted a crime, as the prosecution maintained, or just hardball politics, as Mr. DeLay contended.

Tom DeLay.[8]

(22)     In January 2006, former lobbyist Jack Abramoff pled guilty to charges of

conspiracy, aiding and abetting honest services mail fraud and tax evasion, stemming from a

conspiracy to defraud four Native American Indian tribes which either operated or were

interested in operating gaming casinos.  At that time, the FBI itself acknowledged a wide-ranging

public corruption investigation as part of its ongoing efforts to root out systemic corruption

within the highest levels of government[9] ("the lobbying investigation related to Abramoff and

others"), Abramoff agreed to cooperate with law enforcement officials in the ongoing criminal

investigation.  Abramoff's former business partner, Michael Scanlon, had previously pled guilty

as part of the same investigation and had been cooperating with law enforcement officials as

well.  In both the  FBI and the DOJ January 3, 2006 press releases, then-FBI Assistant Director

Chris Swecker discussed the FBI's criminal investigation into Jack Abramoff's activities which

had been opened two years earlier – in 2004 – and which involved FBI agents in over a dozen

---

[8] Not only does the FBI's policy concerning the handling of third-party requests
demonstrate adherence to the principles of FOIA by balancing the public's right to know with the
individual's right to privacy, it also takes into account preservation of FBI resources.  The FBI's
*Glomar* 6/7(C) policy is designed to promote efficient use of resources in order to meet statutory
and regulatory mandates as the FBI responds to an average of approximately 1244 FOIA and
Privacy Act requests per month.  It would be poor stewardship of already limited resources to
conduct searches in response to each and every third-party request absent proof of death, privacy
waiver or sufficient information to show the public interest outweighs the third-party's privacy
interest.

[9] See "Protecting the Public Trust – Plea Highlights Continued Efforts to Combat
Corruption," FBI Press Release, January 3, 2006,
www.fbi.gov/news/stories/2006/january/public_trust010306.  Indeed, the FBI is uniquely
charged with initiating public corruption investigations and it is the FBI's number one criminal
investigative priority.  See FBI's Top Ten Priorities,
www.fbi.gov/about-us/investigate/what_we_investigate.

field offices, who had combined efforts in a task force which included the Internal Revenue Service ("IRS"), and the Offices of Inspectors General for the Department of Interior and the General Services Administration ("GSA"); required hundreds of interviews; and demanded forensic analysis of thousands of documents and financial records. AD Swecker acknowledged the investigation was continuing and that the FBI fully expected additional subjects to be charged in the future.

(23)    Five years later, this continuing large public corruption investigation has yielded a total of 20 guilty pleas or trial convictions in connection with the activities of Jack Abramoff and his associates.[10] During the course of the investigation, the FBI task force has created an interwoven tapestry of connections among those individuals who have either pled guilty or have been convicted, as well as many other individuals who have provided information to the FBI and who have been persons of investigative interest or who are third parties merely mentioned in the investigative files. Although the FBI acknowledges the existence of a lobbying investigation related to Abramoff and others, at no time has it ever acknowledged Mr. DeLay's status vis-a-vis the investigation.

(24)    In preparing this declaration, the FBI reviewed those documents in main files and cross-reference serials in the CRS which it was able to identify by virtue of the fact that they were indexed under DeLay's name. The FBI has determined that even though it now acknowledges that it has documents which are responsive to plaintiff's request, they are all

---

[10] See DOJ Press Release "Former Abramoff Business Partner Michael Scanlon Sentenced to 20 Months in Prison for Role in Public Corruption and Fraud Schemes," February 11, 2011, www.justice.gov/printf/PrintOut2.jsp. For his part, Abramoff was sentenced in September 2008 to 48 months in prison.

categorically exempt from disclosure pursuant to FOIA Exemptions 6 and 7(C). As a result, all non-public documents and cross-reference serials related to Tom DeLay and which are responsive to plaintiff's request are being withheld in full because to publicly reveal any details from these documents would violate the privacy rights of, first and foremost, Mr. DeLay, and secondarily, the privacy interests of the many other individuals who are mentioned in these documents, and such a disclosure would result in a clearly unwarranted and unwarranted invasion of personal privacy. In response to plaintiff's faxed request dated October 19, 2010, RIDS conducted a preliminary manual and automated search of the CRS on November 2, 2010, using the search terms, "DeLay, Thomas, Dale," "DeLay, Thomas, D," "DeLay, T, D," "DeLay, T. Dale" "DeLay, Thomas," "DeLay, Dale," "DeLay, T," "DeLay, D," "DeLay, Tom, Dale," "DeLay, Tom, D," and "DeLay, Tom." This search yielded numerous documents in the main file of the lobbying investigation related to Abramoff and others as potentially responsive – 58C-WF-228974, as well as several additional cross-reference files in the Washington, New York, San Antonio and Houston Field Offices. As we explained supra, ¶ 17, the decision to index names other than subjects, suspects, and victims is a discretionary decision made by the SAs assigned to work on the investigation. To be sure, the FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval. Thus, RIDS's search was only able to identify those cross-references which had been specifically indexed using Tom DeLay's name. I have been advised that there are numerous other instances in which Mr. DeLay's name is mentioned in documents throughout the file but which were not indexed. However, RIDS's ACS search would not be able to retrieve those other cross-references.

## FOIA EXEMPTION 7 THRESHOLD

(25)     Exemption 7 of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause one of the harms enumerated in the subpart of the exemption. See 5 U.S.C. § 552 (b)(7).  In this major public corruption investigation, the harm that could reasonably be expected to result from disclosure concerns, first and foremost, an ongoing criminal investigation.  Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  Specifically, the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within its law enforcement duty.  The FBI is a law enforcement agency whose mission is to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.  As we have previously noted, the FBI has acknowledged publicly that it has been conducting a wide-ranging criminal investigation of Jack Abramoff and numerous other associates and individuals for illegal campaign contributions and violations of election laws. The investigation of Jack Abramoff and "others" for violating federal election laws  falls squarely within the law enforcement duties of the FBI, and the information gathered readily meets the threshold requirement of Exemption (b)(7).  Next, the FBI will examine whether the material to which plaintiff has requested access may be withheld in its entirety pursuant to Exemption 7(A).

### (b)(7)(A) PENDING LAW ENFORCEMENT INVESTIGATION

(26)     5 U.S.C. § 552(b)(7)(A) exempts from disclosure "records or information

compiled for law enforcement purposes, but only to the extent that the production of such law

enforcement records or information (A) could reasonably be expected to interfere with

enforcement proceedings . . . ."

(27)     Application of this exemption requires the existence of law enforcement records;

a pending or prospective law enforcement proceeding; and a reasonable expectation that release

of the information would interfere with the enforcement proceeding.  Furthermore, in applying

the exemption to the documents in question, Bevis v. U.S. Department of State, 801 F.2d 1386,

1389 (D.C. Cir 1986), imposes a three-part procedure.  The government is required to review

each document withheld on a document-by-document basis; to group the documents into

functional categories and to describe the categories; and to explain why release of each category

would interfere with law enforcement proceedings.

### LAW ENFORCEMENT RECORDS

(28)     Access to the responsive material has been denied to plaintiff in its entirety

pursuant to Exemption (b)(7)(A).  These law enforcement records are from the pending lobbying

investigation related to Jack Abramoff and his associates, which has been explained in greater

detail, supra.  Although the investigative files contain the typical documents found in most FBI

investigative files (including Memoranda, Electronic Communications ("ECs"), miscellaneous

administrative documents, Letterhead Memoranda ("LHMs"), Source Documents/Information,

third-party communications and FBI computer print-outs, Plaintiff has sought access to only four

specific categories of documents:  (1) witness statements, (2) investigation reports, (3)

prosecution memoranda, and (4) FD-302 reports.

## PENDING/PROSPECTIVE LAW ENFORCEMENT PROCEEDINGS
## AND CRIMINAL INVESTIGATION

(29)    In preparing this declaration we have been advised by the case agents who

continue to work on many aspects of this extensive public corruption investigation that due in

particular to the inextricably intertwined and interrelated nature of the documents at issue here,

no information is segregable and releasable at this time. There are several outstanding

convictions and sentencing proceedings in the lobbying investigation related to Abramoff and

others which have not yet been completed. These include, but are not limited to, the sentencing

hearings of Tony Rudy, Todd Boulanger and Kevin Ring.[11] At least until the above-described

cases and all related criminal investigations are completed, the FBI will consider the documents

responsive to plaintiff's request to be in an open and pending status, as premature release of any

of this information would have a harmful effect on these pending matters, which will be

described in further detail below. Thus, no information can be segregated and released to

plaintiff at this time.

## REASONABLE EXPECTATIONS OF INTERFERENCE

(30)    Based on its statutory authority, the FBI has established standard operating

procedures by which to implement the FOIA and Privacy Act as efficiently as possible. In that

respect, when a FOIA/Privacy Act request is received for an on-going FBI investigation, the FBI

in most instances asserts Exemption (b)(7)(A) for that request. However, the FBI does review

the responsive materials to the request and releases information contained within the file(s)

---

[11]    David Safavian's appeal is now over; he reported to prison at the end of July 2011.

which will not jeopardize future investigative or prosecutive efforts.  The FBI's review of the

responsive records for the preparation of this declaration revealed that no material responsive

could be released, as any information released at this juncture has the potential of jeopardizing

ongoing investigations and/or prosecutorial efforts.

(31)    Any release of information from the responsive files would be premature due to

the harm which could ensue.  Once documents are released and are in the public domain,

information concerning the investigation could reach the very individuals who remain under

investigation.  This would allow these individuals to critically analyze the documents pertaining

to themselves.  Such individuals possess the unique advantage of knowing the details

surrounding the investigation, the identities of potential witnesses, direct and circumstantial

evidence, etc., and could use the released information to their advantage.  In this regard, the

following potential harm from the release of these documents exists:

(a)    The identification of individuals, sources, and potential witnesses who
possess information relative to the investigations and possible harm to, or
intimidation of these individuals;

(b)    The use of information released to counteract evidence developed by
investigators;

(c)    The identification of third parties who are also under investigation;

(d)    The locations in the United States, as well as foreign countries, where the
FBI is focusing the investigation and collection of investigative and source
material.

(e)    the use of information released to uncover the government's trial strategy.

(32)    Furthermore, the release of this information to third parties not directly involved

in this matter could allow these third parties to interfere with the pending proceedings through

harassment, intimidations, and creation of false evidence dispensing facts discussed during the

FBI's investigation. Once a release is made to plaintiff under the FOIA and Privacy Act, its use

and dissemination of the information to third parties is unrestricted.

(33)    Historically, the FBI has responded to requests for pending FBI investigatory files,

or portions thereof, with great regard for the intent of the FOIA. The FBI makes every effort to

provide information which will not interfere with the pending law enforcement proceedings. In

this case, the FBI is continuously working in conjunction with other federal agencies to assist

them with investigations and related proceedings in this case. Any waiver of FOIA Exemption

(b)(7)(A) would inhibit the FBI's assistance to the justice system at the Federal level.

## CATEGORIES OF INFORMATION REQUESTED

(34)    Although the investigative file of this multi-year lobbying investigation related to

Abramoff and others contains, in the aggregate, thousands and thousands of serials both in the

main file, sub files, attachments and spin-off related files, plaintiff's request specifically focused

only on access to: any witness statements,[12] investigation reports, prosecution memoranda,[13] and

FBI FD-302 reports in the lobbying investigation related to Abramoff and others.

(35)    **FD-302 and FD-302 inserts ("Interview Forms"/"Witness Statements")**:

These are forms which are used by FBI SAs to record information which they obtain through

witness interviews, as well as other sources such as grand jury subpoenas, proffer agreements and

immunity statements, and from other federal agencies. These forms are often incorporated into

---

[12]  Witness statements are typically documented by case agents in FD-302s.

[13]  I have been advised that the case files do not contain any prosecution memoranda, as it
is the policy of DOJ not to provide these memoranda to FBI SAs due to their work-product
nature.

investigative reports, and may later be used as testimony in criminal or civil proceedings. The contents of these forms may also be incorporated into teletypes, memoranda or letters for purposes of pursuing additional investigative leads. The FD-302s identified range in dates from approximately June 2004 to approximately October 2009. In addition to being withheld in full pursuant to FOIA Exemption 7(A), these documents are also being withheld in full pursuant to Exemptions (b)(2), (b)(3), (b)(6), (b)(7)( C ), (b)(7)(D), and (b)(7)E). These FD-302s contain, in the aggregate, detailed descriptions of names, addresses, telephone numbers of witnesses and other third parties, information, leads, and other valuable investigative information supplied by various sources and third-parties interviewed jointly by the FBI and Other Government Agencies ("OGAs") during the course of their investigation. In addition, responsive FD-302s contain information regarding forensic analysis, information regarding grand jury proffer and immunity statements, and information exchanged between the FBI and OGAs.

(36)     Exemption 3 is asserted to protect information contained in the FD-302s which identifies specific records that may be subpoenaed by a Federal Grand Jury. Any such disclosure would clearly violate the secrecy of the grand jury proceedings and could reveal the inner workings of any federal grand juries that may have been convened to consider the myriad of charges considered this case.

(37)     Exemption 6 is asserted in conjunction with Exemption 7(C) to protect names and identifying information of FBI SAs, support personnel, third parties who provided information to the FBI, third parties merely mentioned, third parties of investigative interest, third parties interviewed, and other federal employees. In considering the public interest in this information, the FBI determined that there is no public interest to be served by releasing the names and

-20-

identifying information of the numerous individuals captured in the array of FD-302s, because this information will not shed light on the operations and activities of the FBI. Any such disclosure would constitute either a clearly unwarranted invasion or unwarranted invasion of their personal privacy.

(38)   Exemption 7(D) is asserted to protect the identities of, and information received from, individuals who provided information to the FBI during the course of the joint FBI-OGA investigation. These individuals were interviewed either under express confidentiality and/or under circumstances from which an assurance of confidentiality may be implied. Interviews conducted under such assurances of confidentiality warrant the protection of the interviewee's name as well as the information the interviewee provided, to the extent that the information would identify the interviewee. A majority of the information captured by the FD-302s reveals the identities of the individuals interviewed, and any release would expose the third parties' identities. If the identities of the interviewees were to be released, it would subject them to embarrassment, humiliation or even possible physical harm not only for themselves, but also for their families. Protection extends beyond the name of the interviewees, and includes all other possible identifying information about the interviewees.

(39)   Exemption 7(E) is asserted to protect procedures and techniques used by FBI SAs during the investigation. Revelation of these details could enable the targets of these techniques to avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use important law enforcement techniques.

(40)   **Investigative Materials/Reports:** This category includes derivative communications and reports analyzing the evidence obtained. A derivative communication

-21-

(investigative report or summary) describes (verbatim or in summary) the contents of the original

evidentiary record, how it was obtained, and how it relates to the investigation.  Other

communications report this information to various agencies, either to apprise them of the

progress of the investigation, or to elicit their assistance in handling investigative leads.  These

materials also include investigative summaries and reports on various aspects of the

investigation.

(41)     **Public Source File**:  Plaintiff was informed that, even if it could not meet the

requirements concerning a third-party FOIA request, the FBI would still search for any public

records maintained in its files, such as court records and news clippings, if plaintiff so desired.

Plaintiff was informed that a  written request for any public documents had to be received within

30 days of the date of the FBI's letter.  Plaintiff did not request these public source documents, so

the approximately 27 news paper clippings which are maintained within the Jack Abramoff

investigation file and which relate to Tom DeLay have not been produced.

(42)     With the exception of public source information, there is no reasonably segregable

portion of any document or evidentiary material which can be released.

## ADDITIONAL EXEMPTIONS UNDER THE FOIA

(43)     The files responsive to plaintiff's request have been denied in their entireties

pursuant to 5 U.S.C. § 552(b)(7)(A).  In light of the D.C. Circuit's ruling in <u>Maydak v. U.S.</u>

<u>Department of Justice</u>, 218 F.3d 760 (D.C. Cir. 2000), FOIA  Exemptions (b)(2), (b)(3), (b)(6),

(b)(7)(C), (b)(7)(D) and (b)((7)(E) are also being asserted and will be discussed briefly below.

## JUSTIFICATION FOR NON-DISCLOSURE UNDER EXEMPTION (b)(2)
## INTERNAL AGENCY RULES AND PRACTICES

(44)   5 U.S.C. § 552 (b)(2) exempts from disclosure information "related solely to the internal personnel rules and practices of an agency."[14]  In this case the FBI asserts Exemption 2 to protect secure and nonsecure internal telephone numbers and secure internal facsimile numbers of FBI personnel, which are related to personnel matters, are not available externally and to the general public, and in which there is no public interest in disclosure.

### Internal Telephone and Fascimile Numbers of FBI Personnel

(45)   Exemption (b)(2) is asserted to protect internal telephone numbers of FBI personnel.  FBI personnel use their work telephone numbers while they are working on significant national security and criminal investigations.  Disclosure of these telephone numbers could subject these individuals to harassing telephone calls which could disrupt official business (including impeding the ability of FBI SAs to conduct and conclude functions related to law enforcement investigations in a timely manner.)  Accordingly, because these telephone numbers are related solely to the internal personnel of an agency, the FBI  has properly withheld this information pursuant to Exemption (b)(2).

### EXEMPTION (b)(3)
### INFORMATION PROTECTED BY STATUTE

(46)   5 U.S.C. § 552 (b)(3) exempts from disclosure information:

specifically exempted from disclosure by statute...provided that such statute (A)
requires that the matters be withheld from the public in such a manner as to leave

---

[14]  Until March 6, 2011, Exemption 2 encompassed two distinct categories of internal agency records: those involving trivial administrative matters of no public interest ("Low 2"), and those more substantial in nature, the disclosure of which would risk circumvention of a statute or regulation ("High 2").  The U.S. Supreme Court's decision in Milner v. Department of the Navy, No. 09-1163, 562 U.S.____, 131 S. Ct.  1259 (2011), eliminates the distinction between low 2 and high 2, and narrows the application of Exemption 2 to those records which relate to employee relations and human resources issues.

no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

### Federal Grand Jury Information

(47)   Exemption (b)(3) is asserted in conjunction with Rule 6(e) of the Federal Rules of

Criminal Procedure to withhold Federal Grand Jury Information.  It is well-established that Rule

6(e) embodies a broad, sweeping policy of preserving the secrecy of grand jury material

regardless of the substance in which the material is contained.  In the responsive documents,

information which explicitly discloses matters that would occur before a Federal Grand Jury is

being withheld pursuant to Exemption (b)(3).  This information includes the names of potential

grand jury witnesses and interview statements pertaining to signed proffer agreements and

immunity statements, which could be used as evidence before a Federal Grand Jury.

Accordingly, any such disclosure would clearly violate the secrecy of the Grand Jury proceedings

and could reveal the inner workings of the Federal Grand Jury which has considered these cases.

The FBI has properly withheld this information pursuant to Exemption (b)(3).

### FOIA EXEMPTION (b)(6)
### CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY

(48)   5 U.S.C. § 552(b)(6) exempts from disclosure:

> personnel and medical files and similar files when the disclosure of
> such information would constitute a clearly unwarranted invasion
> of personal privacy.

(49)   In asserting this exemption, the FBI evaluated the privacy interest of any

individual whose name and/or other identifying information appeared in this record.  In

withholding the information, the individual's privacy interest was balanced against the public's

interest in disclosure.  In making this analysis, public interest information constitutes information

which would shed light on the FBI's performance of its statutory duties. The FBI has concluded that the individual's privacy rights outweighed the public interest in disclosure in those instances where Exemption (b)(6) applies.

(50)   Exemption (b)(6) is asserted in conjunction with Exemption (b)(7)( C ) to protect the names and identifying information of FBI SAs and FBI support personnel, and other government agency personnel involved in this investigation.  FBI SAs and FBI support personnel are responsible for conducting, supervising, and/or maintaining the investigative activities reported in this investigation.  These responsibilities included interviewing sources and reviewing materials compiled as a result of the investigation.  Assignments of SAs to any particular investigation are not by choice.  Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations.  The privacy consideration is also to protect FBI SAs, as individuals from unnecessary, unofficial questioning as to the conduct of this or other investigations, whether or not they are currently employed by the FBI.  FBI SAs conduct official inquiries into various criminal and national security violation cases.  They come into contact with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives.  It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years.  These individuals  may seek revenge on the agents and other federal employees involved in a particular investigation.  The publicity associated with the release of an agent's identity in connection with a particular investigation could trigger hostility toward a particular agent.  There is no public interest to be served by disclosing the identities of the SAs or support personnel to the public.

Thus, disclosure of this information would constitute an unwarranted invasion of their personal privacy.

(51)   Exemption (b)(6) is asserted in conjunction with Exemption (b)(7)( C ) to withhold the names and identifying information about other federal law enforcement personnel who assisted in this investigation.  Disclosure of these individuals' identities could seriously jeopardize their effectiveness in the performance of their official duties.  Further, the rationale for protecting the identities of FBI SAs and FBI support personnel found in the paragraph above also pertains to withholding the names of other federal law enforcement personnel.  There is no public interest to be served by releasing this information.

(52)   Additionally, Exemption (b)(6) is asserted in conjunction with Exemption (b)(7)( C ) to exempt from disclosure the names and/or identifying information of third-party individuals in whom the FBI had an investigative interest in the context of this investigation.  Linkage with any law enforcement investigation carries a strong negative connotation.  Release of the identities of these individuals to the public in the context of an FBI criminal investigation would subject them to harassment or embarrassment, as well as undue public attention.  The personal privacy interests of these individuals would be severely infringed upon if their identities were released in the context of this investigation as individuals of investigative interest to the FBI.  After identifying the substantial privacy interests of these individuals, the FBI balanced their interests against the public interest in disclosure.  The FBI could not identify any legitimate public interest in release of this identifying information since it would not shed any light on the operations and activities of the FBI in this investigation.  Accordingly, the FBI would have properly withheld this information pursuant to FOIA Exemption (b)(6).

(53)    Exemption (b)(6) is further asserted in conjunction with Exemption (b)(7)(C), to protect the names and identifying information of third parties who provided information to the FBI.  Disclosure of the identities of these third parties would have a detrimental effect on the current and future cooperation of other individuals willing to provide information to the FBI inasmuch as they would have little or no faith in the FBI's ability to maintain their information in confidence.  Thus, any specific information provided by these third parties which could ultimately identify them has been protected.  There is no legitimate public interest to be served in disclosing the identity of these individuals.

### EXEMPTION (b)(7)( C )
### UNWARRANTED INVASION OF PERSONAL PRIVACY

(54)    5 U.S.C. § 552 (b)(7)( C ) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy.

(55)    When withholding information pursuant to this exemption, the FBI is required to balance the privacy interests of the individuals mentioned in the documents against any public interest in disclosure.  In asserting this exemption, each piece of information would be examined to determine the degree and nature of the privacy interest of each individual whose name and/or identifying data appears in the document at issue.  The public interest in disclosure of the information is determined by whether the information in question would inform plaintiff or the general public about the FBI's performance of its mission to enforce federal criminal and national security statutes, and/or how the FBI actually conducts its internal operations and investigations.  As explained below, there is no legitimate public interest in the information that

-27-

has been withheld pursuant to Exemption (b)(7)( C).

(56)    Exemption (b)(7)( C ) is asserted in conjunction with Exemption (b)(6) to protect the names and identifying information of FBI SAs and support personnel who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in the investigative activities reported in this investigation.  These responsibilities included interviewing sources and reviewing materials compiled as a result of the investigation. Assignments of SAs to any particular investigation are not by choice.  Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations.  The privacy consideration also serves to protect FBI SAs, as individuals from unnecessary, unofficial questioning as to the conduct of this or other investigations, whether or not they are currently employed by the FBI. FBI SAs conduct official inquiries into various criminal and national security violation cases. They come into contact with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives.  It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years.  These individuals may seek revenge on the agents and other federal employees involved in a particular investigation.  The publicity associated with the release of an agent's identity in connection with a particular investigation could trigger hostility toward a particular agent.  There is no public interest to be served by disclosing the identities of the SAs or support personnel to the public.  Thus, disclosure of this information could constitute an unwarranted invasion of their personal privacy.

(57)    Exemption (b)(7)(C) is also  asserted in conjunction with Exemption (b)(6) to

withhold the names of other federal law enforcement personnel who assisted in this investigation.
Disclosure of these individuals identities could seriously jeopardize their effectiveness in the
performance of their official duties.  Furthermore, the rationale for protecting the identities of
FBI SAs and FBI Support Personnel discussed above also pertains to withholding the names of
other Federal Law Enforcement Personnel.  There is no public interest to be served by releasing
this information.

(58)    Exemption (b)(7)(C) is asserted by the FBI in conjunction with Exemption (b)(6)
to exempt from disclosure the names and/or identifying information of third-party individuals in
whom the FBI has an investigative interest in the context of this investigation.  Linkage with any
law enforcement investigation carries a strong negative connotation.  Release of the identities of
these individuals to the public in the context of an FBI criminal investigation would subject them
to harassment or embarrassment, as well as undue public attention.  The personal privacy
interests of these individuals would be severely infringed upon if their identities were released in
the context of this investigation as individuals of investigative interest to the FBI.  After
identifying the substantial privacy interests of these individuals, the FBI balanced their interests
against the public interest in disclosure.  The FBI could not identify any legitimate public interest
in release of this identifying information since it would not shed any light on the operations and
activities of the FBI in this investigation.  Accordingly, the FBI would be properly withholding
this information pursuant to FOIA Exemption (b)(7)(C).

(59)    Exemption (b)(7)(C) is asserted by the FBI in conjunction with Exemption (b)(6)
to protect the names and identifying information of third parties who provided information to the
FBI.  Disclosure of the identities of these third parties would have a detrimental effect on the

current and future cooperation of other individuals willing to provide information in to the FBI

inasmuch as they would have little or no faith in the FBI's ability to maintain their information in

confidence.  Thus, any specific information provided by these third parties which could

ultimately identify them has been protected.  There is no legitimate public interest to be served in

disclosing the identity of these individuals.

### EXEMPTION (b)(7)(D): CONFIDENTIAL SOURCE MATERIAL

(60)   5 U.S.C. § 552 (b)(7)(D) provides protection for:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement
> records or information . . . (D) could reasonably be expected to
> disclose the identity of a confidential source, including a State,
> local or foreign agency or authority or any private institution which
> furnished information on a confidential basis, and, in the case of a
> record or information compiled by a criminal law enforcement
> authority in the course of a criminal investigation or by an agency
> conducting lawful national security intelligence investigation,
> information furnished by a confidential source.

(61)   Numerous confidential sources report to the FBI on a regular basis and are

"informants" within the common definition of the term.  During the course of an investigation,

individuals and organizations provide information under circumstances from which assurances of

confidentiality can be inferred.  These individuals and organizations are considered to be

confidential sources since they furnish information with the understanding that their identities

and information provided will not be divulged outside the FBI.  Information by these individuals

and organizations is singular in nature and if released, could reveal the informant's identity.

(62)   Releasing the information provided by these sources may likely reveal a

confidential source's identity.  The release of a source's identity would forever foreclose that

source as a future means of obtaining information.  In addition, when the identity of one source is

revealed, that revelation has a chilling effect on the activities and cooperation of other sources.  It

is only with the understanding of complete confidentiality that the aid of such sources can be

enlisted, and only through this confidence that these sources can be persuaded to continue

providing valuable assistance in the future.  Thus, any identifying information provided by, as

well as the identities of, these sources are protected pursuant to Exemption (b)(7)(D).

## EXEMPTION (b)(7)(E)
## INVESTIGATIVE TECHNIQUES AND PROCEDURES

(63)     5 U.S.C. § 552(b)(7)(E) provides for the withholding of law enforcement records

> which would disclose techniques and procedures for law
> enforcement investigations or prosecutions, or would disclose
> guidelines for law enforcement investigations or prosecutions if
> such disclosure could reasonably be expected to risk circumvention
> of the law.

(64)     Exemption (b)(7)(E) is asserted to protect procedures and techniques used by FBI

SAs during the investigation.  Revelation of these details could enable the targets of these

techniques to avoid detection or develop countermeasures to circumvent the ability of the FBI to

effectively use important law enforcement techniques.

## CONCLUSION

(65)     In response to plaintiff's request for third-party information of former

Congressman Tom DeLay at the administrative stage, the FBI appropriately asserted an

Exemption 6 and 7(C) *Glomar* response, neither confirming nor denying the existence of records.

In light of the acknowledgment of a pending lobbying investigation related to Jack Abramoff and

others which contains documents related to plaintiff's FOIA request, the FBI  has pierced the

-31-

*Glomar* veil and admitted the existence of records potentially responsive to plaintiff's request, but nevertheless has withheld these records subject to a blanket Exemption 6 and Exemption 7(C).  In addition, due to the ongoing nature of the lobbying investigation related to Abramoff and others, FOIA Exemption 7(A) also protects all of the requested material in full, along with the underlying FOIA Exemptions 2, 3, 6, 7(C), 7(D) and 7(E), 5 U.S.C. §§ (b)(2), (b)(3), (b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through G attached hereto are true and correct copies.

Executed this 24th day of August, 2011.


DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Record Management Division
Federal Bureau of Investigation
Winchester, Virginia